```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2                          - - -
     TEVA PHARMACEUTICALS  USA,    :   CIVIL ACTION
 3   INC.,and TEVA                 :
     PHARMACEUTICAL INDUSTRIES,     :
 4   LTD.,                         :
          Counterclaim Plaintiffs  :
 5              v.                  :
                                   :
 6   ABBOTT LABORATORIES,          :
     FOURNIER INDUSTRIE ET         :
 7   SANTE, and LABORATOIRES       :
     FOURNIER S.A.,                :
 8        Counterclaim Defendants.  :   NO. 02-1512 (SLR)
     --------------------------    :   (Consolidated)
 9   IMPAX LABORATORIES, INC.,     :
          Counterclaim Plaintiff   :   CIVIL ACTION
10                                 :
            vs.                    :
11                                 :
     ABBOTT LABORATORIES,          :
12   FOURNIER INDUSTRIE ET         :
     SANTE, and LABORATOIRES       :
13   FOURNIER S.A.,                :   NO. 03-120 (SLR)
          Counterclaim Defendants.  :   (Consolidated)
14   --------------------------    :
     IN RE TRICOR DIRECT           :   CIVIL ACTION
15   PURCHASER ANTITRUST           :   NO. 05-340 (SLR)
     LITIGATION                    :   (Consolidated)
16   --------------------------    :
     IN RE TRICOR INDIRECT         :   CIVIL ACTION
17   PURCHASER ANTITRUST           :   NO. 05-360
     LITIGATION                    :   (Consolidated)
18                                 - - -
19                                 Wilmington, Delaware
                                   Tuesday, October 28, 2008
20                                 10:00 o'clock, a.m.
                                         - - -
21
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
22
                                         - - -
23

24                                 Valerie J. Gunning
                                   Official Court Reporter
25
```

1    APPEARANCES:

2
            YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
3           BY:  JOHN W. SHAW, ESQ.

4
                        -and-
5

6           GOODWIN PROCTER LLP
            BY:  DAVID M. HASHMALL, ESQ. and
7                CHRISTOPHER T. HOLDING, ESQ.
                 (New York, New York)
8

9           Counsel for Teva Pharmaceuticals USA, Inc.
            and Teva Pharmaceutical Industries Ltd.
10

11

12          MORRIS, NICHOLS, ARSHT & TUNNELL
            BY:  MARY B. GRAHAM, ESQ.
13

14                      -and-

15
             PATTERSON BELKNAP WEBB & TYLER LLP
16           BY: WILLIAM F. CAVANAUGH, JR., ESQ. and
                 THOMAS PIPPERT, ESQ.
17               (New York, New York)

18

19          Counsel for Abbott Laboratories

20

21

22          RICHARDS, LAYTON & FINGER
            BY:  FREDERICK L. COTTRELL, III, ESQ.
23

24                      -and-

25

```
 1    APPEARANCES (Continued):

 2
                    ARNOLD & PORTER LLP
 3                  BY:  ANNE DAVIS, ESQ.,
                         JAMES COOPER, ESQ.,
 4                       RYAN WATTS, ESQ. and
                         TIMOTHY BICKHAM, EQ.
 5                       (Washington, D.C.)

 6
                         Counsel for Fournier Industrie et Sante,
 7                       and Laboratoires Fournier S.A.

 8

 9
                    MORRIS JAMES LLP
10                  BY:  MARY B. MATTERER, ESQ.

11
                         -and-
12

13                  KEKER & VAN NEST LLP
                    BY:  ROBERT VAN NEST, ESQ.,
14                       (San Francisco, California)

15
                         Counsel for Impax Laboratories, Inc.
16

17

18                  ROSENTHAL, MONHAIT & GODDESS, P.A.
                    BY:  JEFFREY S. GODDESS, ESQ.
19

20                       -and-

21
                    ODOM & DES ROCHES, LLP
22                  BY:  STUART E. DES ROCHES, ESQ.
                         (New Orleans, Louisiana)
23

24                       -and-

25
```

```
 1    APPEARANCES (Continued):

 2
                    GARWIN, GERSTEIN & FISHER
 3                  BY:  BARRY S. TAUS, ESQ.
                         (New York, New York)
 4

 5                         -and-

 6
                    BERGER & MONTAGUE, P.C.
 7                  BY:  ERIC CRAMER, ESQ.
                         (Philadelphia, Pennsylvania)
 8

 9                       Counsel for Direct Purchaser
                         Class Plaintiffs
10

11

12                  PRICKETT JONES & ELLIOTT, P.A.
                    BY:  ELIZABETH M. McGEEVER, ESQ.
13

14                         -and-

15

16                  KENNY NACHWALTER
                    BY:  RICHARD ALAN ARNOLD, ESQ.
17                       (Rogersville, Tennessee)

18

19                       Counsel for Walgreen Co., Eckerd
                         Corporation, The Kroger Co., Maxi Drug,
20                       Inc. D/b/a Brooks Pharmacy, Albertson's,
                         Inc., Safeway, Inc. And Hy-Vee, Inc.,
21                       CVS Pharmacy, Inc. Rite Aid Corporation,
                         Rite Aid Headquarters Corp. and American
22                       Sales Company, Inc.

23
                                 -  -  -
24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4   beginning at 9:57 a.m.)

 5

 6              THE COURT:  Good morning, counsel.

 7              (Counsel respond, "Good morning, your Honor.")

 8              THE COURT:  I'm not exactly sure where we are,

 9   so perhaps I will let you fill me in on what issues are

10   actually going to trial at this point, just to make sure I

11   have understood the papers passing in the night here.  Then

12   I will discuss with you just the very few issues that I

13   think I can resolve at this point.

14              Most of your issues seem to be substantive,

15   having to do with the actual legal standards and jury

16   instructions.  I'm not through with the jury instructions,

17   and, indeed, I checked with my staff, and we've got so many

18   papers in our office, I apologize if we're not up to speed,

19   but I think we just got a disk from plaintiffs for the jury

20   instructions.  I'm not confident we've gotten anything

21   from -- I'm not sure where we are, but for me, to work

22   easily on these, I need disks on the jury instructions.  So

23   that's one thing I did want to ask.

24              So fill me in on whether we are in agreement as

25   to what's actually going to trial and then we'll move on
```

1    from there.

2              MR. VAN NEST:  Thank you, your Honor.  Good

3    morning.  Bob Van Nest, for plaintiff, Impax.

4              I think we're in agreement.  Although we don't

5    have a stipulation buttoned down, I expect that to happen

6    soon.

7              We all agree that the Section 2 monopolization

8    claim is going to trial.  We all agree that the

9    attempt-to-monopolize claim is going to trial.  What I

10   think we've worked out since we were last before your Honor

11   is a stipulation that would call for the plaintiffs to

12   dismiss their Section 1 conspiracy claim and also to dismiss

13   their conspiracy to monopolize claim in exchange for a

14   stipulation from the defendants to the effect that Abbott

15   and Fournier would be treated for purposes of this case as a

16   single entity and that the acts of each one would be

17   attributed to the other.

18             Mr. Cavanaugh and I have spoken about that.

19   We have a stipulation in the works.  We have not entered it

20   yet.  We have not agreed on it.  We hope to submit that to

21   your Honor within a few days.  But I think for planning

22   purposes today, we should assume that it's the Section 2

23   and the attempt to monopolize claim that are in play.

24             And I believe your Honor is correct, that we

25   have submitted a set of jury instructions.  One of the --

1    several of the issues for today, as your Honor noted,

2    relate to the legal standard.  And then beyond that, I think

3    we have just a few cleanup items from last time and some

4    possible heads-up for the Court on evidentiary issues.

5                That's what I would expect.

6                THE COURT:  All right.  Thank you very much.

7                Mr. Cavanaugh?

8                MR. CAVANAUGH:  Your Honor, I agree with Mr.

9    Van Nest.  The only qualification I might make is that the

10   stipulations for purposes of this trial, since we have other

11   parties with other claims, it's for purposes of this trial.

12               THE COURT:  All right.

13               MR. CAVANAUGH:  But I agree with him, that what

14   is left is the monopoly and the attempt-to-monopolize claim

15   under Section 2.

16               THE COURT:  All right.  In which case,

17   obviously, the voir dire and the preliminary jury

18   instructions, need to be revised to reflect all of that.

19               I have reviewed your proposed voir dire

20   questions.  There is some overlap, or at least the questions

21   tend to address the same problem.

22               As an initial matter, it seems to me as though

23   I'm going to limit the questions to you or a member of your

24   immediate family and not just anyone close to you or a dear

25   friend.  I just think that just gets us far afield, and with

1    so many parties involved, I don't want voir dire to take up

2    more time than is appropriate.

3              It is a two-week trial.  There are lots of

4    parties involved here.  I'm thinking I should tell my jury

5    director to bring in a fairly large group and I might seat

6    ten, at least, instead of eight, and if you think I need to

7    seat twelve, then I need to think about that, because that

8    calls for a whole lot more people.  I'm not sure this

9    courtroom is going to be large enough for everyone, so the

10   lawyers who aren't right at the table might have to be in

11   another courtroom for jury selection.

12             I have been doing it in my jury room.  I'm too

13   old to stand for these things anymore, so that tends to make

14   people comfortable and you tend to ask more questions.

15   That's the downside.  But we will, I hope, all of us,

16   exercise some restraint.

17             So with respect to the proposed voir dire, I

18   will address this and get something out to you.  I think you

19   are not far afield; it's just what words I use.  And the

20   only question I found objectionable and one that I just

21   don't read anymore are things, do you ever read scientific,

22   technical and professional trade publications.  I mean, you

23   have the subject areas.  It seems to me as though that is

24   the more appropriate question.

25             So, in any event, I will work on the voir dire

```
 1    and try to get that out to you by the beginning of next

 2    week, if not sooner, as with the preliminary instructions.

 3              With the jury instructions, we will get that out

 4    to you as soon as we can.  Certainly, having everyone

 5    working with the same standard as we go in is an important,

 6    I think, issue.  So I will, in the guise of jury

 7    instructions, I will be getting those out to you as soon as

 8    I possibly can as well.

 9              I think, with respect to -- let me get my

10    papers here.  There were two issues that I thought could be

11    addressed that were not substantive.  Well, one was a single

12    actor defense and that has been taken care of.  The other

13    are these retrospective chart reviews.  I've read this.  If

14    you all want to add something to your presentations, I'm

15    happy to hear that.  That was the only real evidentiary

16    dispute I thought we could address sooner rather than later.

17              So I think I will let defendants, Mr. Cavanaugh,

18    I don't know whether anyone on your team wants to

19    address --

20              MR. CAVANAUGH:  Your Honor, Lawrence Pippert

21    will address those things.

22              THE COURT:  All right.  Thank you.

23              MR. PIPPERT:  Good morning, your Honor.  My name

24    is Tom Pippert.

25              As your Honor knows, there are two studies of
```

1    patient medical records that are at issue here.  Abbott

2    commissioned NDC Health to review the patient records that

3    were maintained in a database by G.E. Healthcare, and have

4    also commissioned a pharmacist, Dr. Daniel Hilliman, of

5    Creighton University Cardiac Center, to review patient

6    records at that cardiac center.

7           Dr. Hilliman's review was published this year in

8    the journal called "PharmacoTherapy," and that's the Journal

9    of the American College of Clinical Pharmacies.

10          Both of these studies were designed to look at

11   clinical outcomes for patients who were taking the

12   defendants' product TriCor 160 and then have after the

13   new product, TriCor 145 was introduced, the same patients

14   took TriCor 145.  And both studies were designed to see

15   whether the clinical outcomes of the patients improved

16   when they were taking the TriCor 145 in comparison to the

17   TriCor 160.

18          And, by clinical outcomes, I mean, did their low

19   density lipids, LDL, go down, as you want, when you are

20   taking a cholesterol medicine.  Did their high density

21   lipids go up, which is what you want when you are taking a

22   cholesterol medicine, and did their triglycerides go down,

23   which is what you want to have happen when you take a

24   cholesterol medicine.

25          Both studies involved very significant patient

1     populations.  For the NDC health people that used the

2     database of G.E. Healthcare, they found 108 patients who had

3     taken TriCor 160, and then, when the new product was

4     introduced, the same 108 patients took TriCor 145.  They

5     also did a comparison of people who took only TriCor 160 and

6     people who took only TriCor 145, and they had almost 600

7     patients in that arm of their study.

8             And for the Creighton University study, there

9     were 130 patients who had started on TriCor 160 and then

10    were moved into TriCor 145.

11            What the NDC people found, looking in the

12    database, and this is looking at the 108 patients who were

13    first on TriCor 160 and then subsequently on TriCor 145,

14    their triglyceride levels went down when they were on TriCor

15    145, which is the direction you want your triglycerides to

16    go.  Their low density lipids went down, which is the

17    direction that you want your low density lipid to go.

18            And the conclusion of the -- from the data from

19    the Creighton University Cardiac Center was that there was a

20    subgroup of patients who had substantial improvements in

21    their lipid profiles.

22            I would like to contrast those studies to the

23    studies that are involved in the three cases that were cited

24    to your Honor by the plaintiffs.  The Jones case involved

25    three studies.  None of them involved the dynamics that we

1    have here, where people were first on one product and

2    secondly, on another product.

3              In the Jones case, there were three studies that

4    the plaintiffs' expert relied on.  One of those studies

5    involved only five patients and a third study involved only

6    one patient.

7              In the Wade Grow case cited by plaintiffs, there

8    were two studies that were cited there.  One was a single

9    case report about a single patient and the other one

10   involved a plaintiff in a single product liability

11   litigation.

12             And in the case in Casey lawsuit, there were

13   also two studies that the expert would rely on.  One of them

14   involved five reported cases, and the other study involved

15   four case reports.  Very, very small populations in

16   comparison to what NDC Health did and what the Creighton

17   University Cardiac Center did.

18             Now, we are -- what the defendants are using

19   these comparisons of the TriCor 160 patients and the TriCor

20   145 patients for a very discrete purpose.  One of the

21   defense experts, Professor Goldkind, says that these types

22   of studies that were done, the NDC Health study and the

23   Creighton University study, are studies of real world data

24   that are commonly performed and, in his opinion, that they

25   are an efficient way to explore the possibility of what one

1    might see happen in the real clinical outcomes.

2              Now, emphasize, you know, the nonconclusiveness

3    of that.  These are a possibility and it's what one may see

4    in the real world.

5              And Dr. Jones, who is one of the physician

6    experts the defendants will be calling, has looked at these

7    two studies, and his conclusion is that they suggest that

8    patients have a better lipid profile with TriCor 145 than

9    they do with TriCor 160, and that these studies indicate,

10   only indicate, that TriCor 145 may, in fact, provide an

11   improved lipid profile.

12             So on the defense side, no one is going

13   overboard about what these studies show.  But the

14   plaintiffs, however, contend that there is no difference at

15   all between TriCor 160 and TriCor 145.  The defendants say

16   there is some evidence that suggests there are better lipid

17   outcomes.  And we submit, your Honor, that the jury should

18   be able to hear that evidence when Dr. Goldkind and Dr.

19   Jones testify about these two studies.

20             Plaintiffs can make all of their arguments to

21   the jury about there are more rigorous ways this could have

22   been tested.  They can make all their arguments about how

23   Dr. Jones' conclusion is only that these are indicative and

24   suggestive, but we submit that the jury should hear that

25   evidence in contrast to the plaintiffs' contention that

1    there is no difference between the TriCor 160 and the

2    TriCor 145 when it comes to treating the lipid profiles of

3    patients.

4              Thank you, your Honor.

5              THE COURT:  All right.  Thank you.

6              Let's hear from --

7              MR. VAN NEST:  Your Honor, Mr. Des Roches is

8    going to cover this for the plaintiffs.

9              THE COURT:  All right.  Thank you.

10             MR. DES ROCHES:  Good morning, your Honor.

11   Stuart Des Roches, on of behalf of the Direct Purchaser

12   Class Plaintiffs.

13             THE COURT:  Good morning.

14             MR. DES ROCHES:  I agree with some of what

15   Mr. Pippert said, but disagree on other very significant

16   aspects of it.

17             Mr. Pippert mentioned various patient

18   populations.  He said lots of patient populations were

19   looked at here.  What he did not mention, and what is

20   critical to this issue, is, he didn't say, and he cannot

21   say that the studies were well and adequately controlled

22   studies put together with the help of statisticians to

23   ensure that the results of those studies that they now

24   want to put before the jury are statistically significant

25   real results.

1            Mr. Pippert did say that the purpose of these

2    studies, and I agree with him on this, is to explore the

3    possibility of outcomes and what one may see.

4            These studies are conclusive of nothing.  What

5    they are, as admitted in the studies, and by their own

6    experts, these are retrospective chart reviews.  These are

7    not clinical studies.

8            What retrospective chart reviews means is that

9    you will hire a doctor to go look at old patient records,

10   not patients who were part of a formalized clinical study

11   that is well controlled with placebos and double binding,

12   to ensure that all other causative factors are accounted

13   for.  This is just a review of old patient records.  And

14   they are used for the purpose of generating hypotheses,

15   meaning, you go back and you look at patient records and

16   you see if maybe it occurs to you that there is some trend

17   in there.  But you cannot account that these trends are

18   actually due to, in this case, one drug being better than

19   the other drug.

20           At that point, under standard, very standard

21   scientific testing methods, you generate your hypothesis.

22   Then you design well-controlled clinical studies, in

23   which you take these drugs and give them to human beings

24   as well as placebos.  Then you see what the results

25   are.

1           These studies are only the first step of the

2    scientific method, to generate a hypothesis that then has

3    to be tested with controlled testing, to see if the

4    hypothesis is right or wrong.  Does the 145 cause

5    improvements?  Well, the end result of these studies is,

6    well, it may, or it may not.

7           The point is, no one knows.  No one knows.

8    But what the defendant will do is take these hypothesis-

9    generating reports to which they admit one cannot draw,

10   scientists can't draw conclusions from them, but they want

11   to put them to the jury and let a jury reach scientific

12   conclusions that the 145 is, indeed, better than the 160,

13   even though scientists can't use these studies for that very

14   purpose.

15          Your Honor, this is critical.  Here's what

16   Hilliman and Bob Simko, who run these studies, say about

17   their own studies, and this is what Abbott says about these

18   studies at the time, and what their experts say about them,

19   on these very points.

20          This is the Hilliman study, and this is what

21   Dr. Hilliman himself said about his own studies,

22   retrospective chart reviews:  Our study, unfortunately,

23   was not designed to determine the mechanism of the

24   improvement in lipid parameters observed in some of our

25   patients.  In other words, the study was not designed to

 1    determine whether the 145 caused those improvements.

 2            What he goes on to recognize is that these

 3    patients who are on the 160, their lipid parameters say,

 4    good cholesterol may have already been on the rise and

 5    then they switched them to the 145, or they may have

 6    continued to rise under the 160 if they hadn't taken the

 7    145.  Maybe they cleaned up their diet.  Maybe they started

 8    exercising so their lipid parameters were continuing to

 9    improve and it had nothing to do with the 145.  Dr. Hilliman

10    admits that very thing in his report.

11            Here's what Dr. -- Bob Simko says about the NDC

12    report.  It's in the report itself.  Patients treated with

13    TriCor 160 and then moved to TriCor 145 showed some

14    continued improvements in lipid metrics, although the

15    differences between the two strengths are not -- are likely

16    not statistically significant, not statistically

17    significant, indicating that the 145-milligram strength is

18    comparable to the 160 with respect to improvement outcomes.

19    Not statistically significant.

20            More importantly, even more importantly than

21    Hilliman and Mr. Simko himself, here's what Abbott

22    internally thought about these studies, and this statement

23    is from Abbott's statistician, an internal employee that

24    helps design these clinical studies that they did not

25    run here, well-designed clinical studies, get the

 1    statisticians involved to make sure that all parameters

 2    are covered.

 3              Here's what she says, talking about the

 4    Hilliman study:  This was not a randomized trial and so

 5    there are limitations to what you can conclude from the

 6    data.  Since patients were not randomized, we do not

 7    know how patients would have done had they not switched

 8    to the 145.

 9              They have no idea if these patients would have

10    stayed on 160, would they have obtained the exact same

11    results that they obtained since they switch to the 145?

12    It is impossible to know that from these trials, and Abbott

13    said as much internally.

14              There are two experts in this case, outside

15    experts, Dr. Colgon (phonetic).  Here's what he says:

16    The studies, talking about the Hilliman and the NDC studies,

17    are exploratory hypothesis-generating studies that were

18    designed, as many such studies are, to examine, to compare

19    the effect of the two products based on the real world

20    patient data.  It was acknowledged by those who carried

21    out the studies that such studies would be of use as

22    hypothesis-generating in a real world setting, but would not

23    be submitted to the FDA for regulatory purposes.

24              They knew they could not submit these to the

25    FDA for regulatory purposes because these are only

```
 1    hypothesis-generating, not driven to conclusions.

 2              If you wanted to be able to advertise to the

 3    FDA, for instance, let's take this instance, that the 145

 4    is better than the 160, you cannot rely on these kind of

 5    studies.  You have to generate your hypothesis, as they did,

 6    and then you would have to run well-controlled clinical

 7    studies and then see what the results are.  And if those

 8    clinical studies come out the way you want them to, then you

 9    submit that data to the FDA.

10              Jones, their other expert, says the same thing.

11    I won't repeat it because it's the same thing as Goldkind.

12              Here's the real kicker, your Honor.  First of

13    all, these Hilliman and Simko reports were done well after

14    the 145 application was submitted to the FDA.  Those two

15    retrospective studies were done after Abbott got approval,

16    brought them to market and switched the market from the

17    160 to the 145.  So no Abbott witness can say that

18    contemporaneously in coming up with the design and idea for

19    the 145, they relied on Hilliman or NDC.  They didn't exist

20    until 2005, 2006.

21              In 2002, Abbott considered doing those exact

22    same kind of clinical studies we've been talking about, to

23    run a well-controlled clinical study to actually show and

24    demonstrate whether the 145 actually is better than 160, and

25    they decided not to do it.  And the reason they decided not
```

1    to do it is significant.  They ran what are called

2    simulations.

3             Before a company like Abbott or Fournier will

4    invest in clinical studies which can be expensive, they will

5    run simulations.  They will take the best data available to

6    them at a given time, plug it into a computer or other, some

7    other computing mechanism, and they can simulate, as best as

8    possible, what they think those clinical studies are

9    actually going to show, what the actual income is -- what

10   the actual outcome is.

11            And they said that clinical studies on this

12   point, 145 versus 160, clinical studies on this point are

13   not justified.  Simulations show that clinical impact is

14   minimal.  That's what their own simulation showed.  They

15   decided not to run the clinical studies.

16            So what are we left with in this case?  They

17   want to take Simko, the NDC Health studies.  They want to

18   take Hilliman, and they want to present them to the jury

19   and say, yes, their retrospective chart views the

20   hypothesis-generating, but we want you, the jury, to

21   conclude that these, in fact, show that the 145 is better

22   than the 160.

23            They want that jury to reach a scientific

24   conclusion that internally at Abbott, externally with their

25   experts and with Hilliman and Simko, all of those folks say

1    you can't get there based on these studies, but they want a

2    jury to get there.

3              We say, your Honor, that's unduly prejudicial.

4    It will give rise to an inappropriate and wrong,

5    unreasonable, irrational conclusion, potentially, by a

6    jury.

7              I also point out that Mr. Simko and Dr. Hilliman

8    are not on the witness list.  They're not going to call them

9    to testify, as far as we know, which gives rise to certain

10   hearsay problems as well.

11             Your Honor, for those reasons, in addition to

12   the case law we cited, in which these cases all stand for

13   the general proposition that if you are not relying on

14   well-controlled studies, it's basically junk science in

15   terms of showing causation, affirmative causation between a

16   drug product and what it is you're trying to treat.

17             Thank you, your Honor.

18             THE COURT:  All right.  Thank you.

19             Let's hear from defendants' counsel, if you

20   choose to respond.

21             MR. PIPPERT:  Your Honor, I will only repeat

22   what the purpose for which we are offering this.  We stand

23   by what Dr. Goldkind and Dr. Jones said that these studies

24   show.  They are suggestive and indicative of improvement.

25             This is evidence to counter the plaintiffs'

1    position that that there is absolutely no difference between

2    the TriCor 160 and the TriCor 145.  If we were going to be

3    presenting these studies as conclusive evidence of a

4    difference, I would think perhaps the plaintiffs would have

5    a prejudice argument to make, but we've made it clear that

6    is not the purpose for which these are being offered.  The

7    data exists.  It's rigorous in terms of the number of

8    patients that were observed.

9               Professionals, as Dr. Goldkind will testify,

10   do look at these sorts of studies, will be hypothesis-

11   generating and indicative of what may be going on in the

12   real world, and Dr. Jones will testify to the same point.

13   It is some evidence that there is a clinical difference

14   in the outcomes for patients taking TriCor 160 versus

15   TriCor 145.  It is not an attempt to prove, as in product

16   liability cases cited by plaintiffs, medical causation as an

17   element of the cause of action.

18               All of those cases were throwing out experts

19   relying on one to five case reports, patient studies of

20   less than a dozen people, to try to establish the element

21   of a products liability cause of action.  That is not

22   the way in which we propose to use this evidence, your

23   Honor.

24               Thank you.

25               THE COURT:  All right.

```
 1              MR. DES ROCHES:  Your Honor, if it please the
 2   Court, could I just have an additional minute to follow up?
 3              THE COURT:  Sure.
 4              MR. DES ROCHES:  Here is what Abbott says in
 5   terms of how they want to use this evidence.  This is what
 6   they told your Honor.  In describing Hilliman and NDC, they
 7   call them two clinical studies, which provide evidence
 8   that 145, TriCor 145, led to better clinical improvements
 9   than TriCor 160.  These are not clinical trials in which
10   these drugs were given to live human beings with placebos
11   and all sorts of controls.  Simply wasn't done.  That is an
12   inappropriate purpose.
13              If the defendants -- it raises an interesting
14   question.  If the defendants are not going to use Hilliman
15   and Simko for the purpose of trying to convince the jury
16   that the 145 really is better than 160, then it raises a
17   relevance question as to, well, what relevance are these
18   studies to anything?  That Abbott and Fournier conduct
19   retrospective chart reviews?
20              That's not an issue in this case.  What is the
21   issue in this case is whether there's any improvement
22   between the 145 and the 160.  That's the issue in this case.
23   And this kind of evidence could only serve to confuse the
24   jury and lead the jury to reach a conclusion on improvement
25   that is not to be found, no rational basis to be found in
```

1    these studies.

2              One additional note on one of the cases that we

3    cited.  It's the Pfizer versus Miles case, and it was a

4    Lanham Act case, false advertising case.  And one of the

5    parties in that case had hired Dr. Hilliman to run a study

6    between two drugs, and very similar to these retrospective

7    chart reviews, Dr. Hilliman had taken some patients that

8    were taking one drug and switched them to another drug and

9    then drew certain conclusions as to whether one drug was

10   better than the other.  The problem was, same problem with

11   these retrospective chart reviews.  They were not adequately

12   and well controlled.

13             The Court, reviewing whether one of the parties

14   could go forward with their false advertising Lanham Act

15   claim, found that, the Court concludes that because of the

16   absence of a written protocol and scientific controls,

17   including blinding, to ensure the objectivity and accuracy

18   of the data, the Hilliman study cannot be characterized as

19   reliable, and went on to find that because one

20   pharmaceutical company was relying on that kind of study

21   which is very similar, if not virtually identical to what

22   they've done here, that reliance on that kind of data to

23   claim that one drug is better than the other is a literal

24   falsity, because it's not based on any scientific principles

25   or real scientific testing.

1          Your Honor, we can think of no legitimate

2    purpose for putting Hilliman and NDC before the jury in

3    light of what the issues are in this case.

4          Thank you, your Honor.

5          THE COURT:  All right.  Thank you.

6          MR. PIPPERT:  Your Honor, may I have two seconds

7    and I will do it from here?

8          THE COURT:  Yes.

9          MR. PIPPERT:  The Pfizer case, this is not a

10   Lanham Act case, and the study there included 24 patients, a

11   fraction of what we are talking about with the two studies

12   that we propose.

13         Thank you.

14         THE COURT:  All right.  I will issue a decision

15   about that, again, I hope within a week.

16         Aside from the two evidentiary issues, one of

17   which has been resolved by you and the one we've just

18   discussed and the substantive issues that will be addressed

19   through the jury instructions, are there other issues that

20   we need to address?

21         MR. VAN NEST:  Your Honor, Bob Van Nest again.

22         Just to alert the Court, I think that what we

23   understood from last time, with respect to your

24   pre-instructions, was that we would work together,

25   plaintiffs and defendants.  We sent some suggested

1    changes.  We have not got to final on that with the

2    defendants.  I think what we ought to do is work with them

3    together to submit --

4              THE COURT:  The preliminary jury instructions?

5              MR. VAN NEST:  Right.  The preliminary ahead of

6    time.  And in that regard, we submitted to your Honor,

7    because we hadn't heard anything back from defendants, a

8    short Hatch-Waxman instruction.  We understood that your

9    Honor last time said the jury needs to understand

10   Hatch-Waxman or be given some information about it, either

11   through a pre-instruction or through expert testimony, and

12   we submitted one to the defendants.  We have not heard

13   anything.  We submitted to it your Honor.  We're still

14   working with them on it.  But your Honor now has it as of

15   last night, as what the plaintiffs think would be necessary

16   in that regard.

17             THE COURT:  Well, I guess the only question I

18   have is, at what point can I assume that you are not going

19   to be submitting something that's agreed upon and that I

20   need to do it myself?

21             MR. VAN NEST:  You tell us.  We can do it by the

22   end of the week, or by Monday.

23             MR. CAVANAUGH:  Your Honor, on the preliminary

24   jury instruction, why don't you give us until -- I think the

25   parties are pretty close on the preliminary jury

1    instructions.

2              Why don't you give us until Thursday morning,

3    and we'll get something to you that's either agreed upon or

4    we'll tell you what the difference is.

5              MR. VAN NEST:  I think with travel and so

6    on, your Honor, we would be better off giving it to you

7    Friday.

8              MR. CAVANAUGH:  That's fine.

9              THE COURT:  All right.  All right.  I will

10   either hear by the end of the day Friday, you either give me

11   what you've agreed upon and the differences, or give me

12   something not agreed upon.  All right?

13             MR. CAVANAUGH:  All right.

14             MR. VAN NEST:  We'll do that.

15             THE COURT:  All right.

16             MR. VAN NEST:  Just coming back to your Honor's

17   comments on number of jurors, we think that getting a larger

18   panel is a good idea.  I mean, I'm worried that with

19   Thanksgiving approaching and a trial that goes into that

20   week, we're going to have a lot of people trying to wriggle

21   a way out of jury service, and so whatever number your Honor

22   wishes to seat sounds good to us, and having more, a larger

23   panel than a smaller panel, is a good thing, I think this

24   time of year.

25             We certainly don't want to end up in a situation

1    where we've worked hard, presented the case and we suffer

2    attrition late that last week.  And I think we are going to

3    be looking at a lot of resistance from jurors, possibly,

4    serving Thanksgiving week.

5              THE COURT:  A two-week antitrust case butting up

6    against Thanksgiving?  I can't imagine.

7              MR. CAVANAUGH:  At least it's not a patent case,

8    your Honor.

9              MR. VAN NEST:  Your Honor, one other issue

10   that's left over from the earlier pretrial that was in the

11   pretrial papers that has a time element to it, the

12   defendants indicated in the pretrial that they wanted to

13   present deposition testimony from experts that were

14   disclosed by the plaintiffs and were retained by the

15   plaintiffs, but were not designated for trial.  These are

16   three experts:  Mr. Soto and Dr. Grimm and Dr. Robbins,

17   that we do not intend to call.  We designated them.  They

18   were deposed late last year and early this year.

19             Under the Pfizer case, which is a Judge Farnan

20   opinion from 2005, and under the Kirk case, which is a

21   Third Circuit, this is not proper.  It's hearsay.  They've

22   made no effort to obtain these experts live.

23             The cases all say that it's one thing to have a

24   precipient fact witness unavailable because they're outside

25   the hundred miles, but with an expert, that expert, there's

1    nothing unique about them.  They have their own experts on

2    these subjects.  As far as we know, they've made no effort

3    to get the experts here live.  It's hearsay.  They shouldn't

4    be able to read the transcript.

5            The Pfizer case says that.  The Kirk case says

6    that.  Judge Jordan has allowed it in some instances, based

7    on Rule 32, which pertains to how depositions are handled,

8    but in those cases, there had been extensive reliance on

9    the experts by the party opposing the depositions, and he

10   is not recognizing what many other courts recognize, which

11   is that unavailability is different for an expert than it is

12   a precipient witness.

13           Experts are retained to provide independent

14   testimony.

15           THE COURT:  That has been my general rule, so it

16   would be the defendants' burden to demonstrate that there's

17   some compelling reason that puts us outside my general rule.

18   I don't know what that is at this point, but I guess I will

19   hear from them in that regard.

20           MR. VAN NEST:  And I think we had one or two

21   other housekeeping questions.

22           THE COURT:  All right.

23           MR. VAN NEST:  One I had was, if the parties

24   agree that it would be desirable to have individual

25   monitors in front of the jury box that would allow jurors

```
 1    to see better than on the screen, there are two reasons for

 2    that.

 3              One, both sides intend to play quite a bit,

 4    not quite a bit, but some significant deposition testimony,

 5    witness testimony for jurors, that will involve showing

 6    documents along with the witness, where we have a split

 7    screen.  The technology works quite well, but I'm just

 8    worried that with a screen across the room, it will be

 9    difficult to see.

10              And, again, what we were hoping to reach

11    agreement on with Abbott and Fournier was that we would set

12    up, obviously, at our expense, monitors closer to the jurors

13    so they could see.  Not one for each juror, but monitors

14    across the front of the jury box, so that people would have

15    an easier time to see.

16              THE COURT:  My concern about that is twofold.

17              Number one, I think -- well, I would be

18    concerned about using that when you have live witnesses,

19    because I've heard from many lawyers that the jurors,

20    because we're all so attuned to watching TV in this country,

21    they tend to watch the TV instead of the real person.

22              The second is that -- I mean, we don't have a

23    whole lot of room here.  This courtroom is not set up for

24    it, and I am wondering whether I am even going to be able to

25    see the jurors and vice-versa, because they'll have these
```

1    multiple screens set up here.

2              I would rather you think about putting together

3    a notebook with the exhibits, and if that's really your

4    concern, making sure the exhibits are seen, an individual

5    notebook for each of these.  I would rather you do that

6    than have all of this equipment, what I regard as clutter,

7    so long as there has been no objection that the exhibits

8    will be deemed admissible so that the jurors can follow

9    along.

10             Now, they wouldn't keep those.  I mean, I'm

11   just --

12             MR. VAN NEST:  That's fine, your Honor.  We'll

13   do it that way.  That's appropriate.

14             THE COURT:  All right.

15             MR. VAN NEST:  We'll work with the defendants to

16   try to get that done.  We may, then, need your help to be

17   sure we can resolve any remaining disagreements with those

18   documents that would go in the notebook, but I don't think

19   that will be a time-consuming project.

20             THE COURT:  All right.

21             MR. VAN NEST:  I will call on Mr. Arnold.

22             MR. ARNOLD:  Your Honor, I have, actually, I

23   have a couple of questions.  Richard Arnold, on behalf of

24   the Walgreen plaintiff.

25             One has to do with just what you prefer and

1   making sure that we have your protocol down properly.

2          I understand from the last pretrial, you said

3   you didn't want documents introduced without a witness,

4   so that the jury would be aware of what's going in and

5   you would be aware of what's going into the record.

6          Would that, then, normally, if you have a

7   document that's unobjected to out of Abbott's files, at

8   the beginning of the case, we would move those into

9   evidence.

10         Do you permit the use of the document that's

11  unobjected to with a witness that has knowledge of the

12  information, but would not be able to foundate that document

13  prior to the time that the document is introduced into

14  evidence?

15         THE COURT:  The reason that I make documents

16  come in through witnesses is to make you all exercise some

17  self-restraint, because I can see 500 documents coming

18  without it.  So setting that aside, if documents, if you all

19  have agreed that certain documents are admissible, there

20  will be no objection, you need to identify those, quite

21  frankly, before, I mean, before trial starts, perhaps the

22  morning of trial, so we have an indication.  Well, I guess

23  for each witness.

24         My problem with all of this is, is that I

25  don't trust lawyers anymore in terms of having some real --

```
 1   I mean, this isn't a post-trial.  This is not a bench trial,

 2   where the Court will take lots of time to review the

 3   exhibits consistent with not only the evidence, but with

 4   post-trial briefing.  These are jurors who need to have some

 5   foundation for these.

 6             So if you can work out something, I'm happy to

 7   review it with you all.

 8             MR. CAVANAUGH:  Your Honor, the process that

 9   we've laid out in the pretrial order, which I've used in

10   front of your Honor before is, two days before the witness

11   is going to go on, you identify what documents you're going

12   to use with that witness.

13             THE COURT:  Right.

14             MR. CAVANAUGH:  I would think if there is a

15   document that's completely foreign to that witness and we

16   would have an objection to it or they would have an

17   objection to it, you would raise it the next morning, just

18   as the night before you serve your demonstratives, so if

19   there's a problem with the demonstrative, we'd take it up

20   before Court starts.

21             I think that is how it has worked in the past

22   in front of your Honor and it has tended to work out that

23   way.

24             THE COURT:  Right.  And I guess the question,

25   though, is whether, if an exhibit is going to be introduced
```

1    for the first time with a witness who can't necessarily

2    authenticate it, but the document does not have -- there's

3    no objection to its admission, whether it's coming in

4    through a witness, basically, and I think the answer is

5    yes.

6                    MR. ARNOLD:  Okay.

7                    THE COURT:  If you all agree to that.

8                    MR. CAVANAUGH:  I agree with it.  Most of these

9    are business records, your Honor.

10                   THE COURT:  All right.

11                   MR. CAVANAUGH:  I think if it's something that's

12   simply so fortune to the witness that there's something

13   fundamentally unfair, not necessarily about it going into

14   evidence, but about this witness being questioned about

15   it --

16                   THE COURT:  Right.

17                   MR. CAVANAUGH:  -- I think that's probably two

18   different issues.

19                   THE COURT:  Right.  I agree.

20                   And, by the way, not that it does much good, but

21   it makes me feel better, I have posted new guidelines on my

22   website, so if you have questions, you might want to check

23   there first.  But anyway...

24                   Yes?

25                   MR. ARNOLD:  Yes, your Honor.  And one more

1    question.  It has to do with the number of jurors.

2              Obviously, we didn't know -- did not expect

3    you to, or I didn't even know whether you were asking us

4    to comment on the number, or are you just telling us what

5    you were thinking out loud about, which will be apparent in

6    a moment.  Mr. Van Nest and I have not had a moment to

7    discuss that.

8              THE COURT:  Sure.

9              MR. ARNOLD:  As a plaintiff, we bear the burden

10   of proof.  Every person that goes into that box is someone

11   else we have to convince.

12             I have always thought that, and this always is a

13   big question in the federal system because everybody sits,

14   how many jurors are appropriate?  Obviously, only six are

15   needed for the verdict, so how many more do you put in the

16   box?

17             It has always been, unless there's something

18   unusual here, and I've never tried a case in Delaware, so

19   do you lose a lot of jurors after they're sworn and in the

20   case?

21             THE COURT:  Well, I generally start with eight.

22   Lately, I don't know.  For the last six months, I've managed

23   to lose one, so we're down to seven --

24             MR. ARNOLD:  Right.

25             THE COURT:  -- it seems in every case.  And most

```
 1    of my cases in the recent months have not been two-week

 2    cases, so --

 3                 MR. ARNOLD:  With the rule of thumb, the one

 4    that I've used in other places, a rule of thumb is you start

 5    with six and you add a juror per week, and up until you get

 6    to ten, and then at that point, you kind of weigh out how

 7    much further that case is going.

 8                 THE COURT:  Right.

 9                 MR. ARNOLD:  Using that, eight would probably be

10    appropriate for a two-week trial here.

11                 I agree that maybe seating jurors will be

12    difficult because of the schedule.  I don't imagine, at

13    least it has never been my experience, that jurors that have

14    been sworn and start into a trial suddenly take off because

15    it's Thanksgiving.

16                 THE COURT:  I don't think that's going to be the

17    problem.  I think it is just that I have been unlucky with

18    my jurors lately.

19                 We had, on the first day of trial, we had a

20    juror whose mother who was waiting for him got raped.  Just

21    all sorts of awful things have happened.  Don't tell the

22    prospective jurors that because I don't want to have them

23    afraid to sit in one of my cases.

24                 Well, I'm thinking eight is always --

25                 MR. ARNOLD:  Right.
```

```
 1              THE COURT:  -- the starting place.  The question

 2    is whether I go to ten.  I won't go more than ten.  So I

 3    appreciate your thoughts on that.

 4              MR. ARNOLD:  Thank you.

 5              THE COURT:  Anything else from plaintiffs?

 6              MR. HOLDING:  Good morning, your Honor.  Chris

 7    Holding, for Teva.

 8              On evidentiary issues before you, I just wanted

 9    to remind the Court, mindful of your view of Daubert, there

10    is one Daubert motion.

11              THE COURT:  Oh, all right.

12              MR. HOLDING:  I don't know that you need to

13    entertain hearing on it today, but it is the motion that

14    Teva and the others filed with respect to an expert named

15    Sally Look, and Sally Look was going to provide testimony

16    with basically two different sets of opinions:  One with

17    respect to Teva, one with respect to Impax.  The motion that

18    was filed is to exclude her from the -- to provide her Teva

19    opinions.

20              THE COURT:  All right.  I will certainly take a

21    look at that.

22              MR. HOLDING:  Thank you.

23              THE COURT:  Thank you for reminding me.

24              Anything else?

25              MR. VAN NEST:  I believe that's it, your Honor.
```

```
 1              MS. McGEEVER:  One more housekeeping matter,

 2    your Honor.  I guess two.

 3              Just to confirm, the jury will be picked on the

 4    Friday before, November 7th?  I think that was a scheduling

 5    point that you were going to get back to us on.

 6              THE COURT:  Yes.  Yes.  It's on for 9:30 on the

 7    7th.

 8              MS. McGEEVER:  Thank you, your Honor.

 9              Secondly, Mr. Goddess and I rise to ask if we

10    may be excused from attending every single day of trial.

11    I've been Delaware local counsel for the Kenny Nachwalter

12    firm and the Henley firm.  All of their team has been

13    admitted pro hac and we will be available should the Court

14    need us or should our co-counsel need us, but to sit through

15    every day of trial probably is not necessary given the

16    number of other attorneys who will be in the courtroom.  So

17    I would appreciate that indulgence.

18              MR. GODDESS:  Your Honor, I have been local

19    counsel and my firm for the Direct Purchaser Class and the

20    folks from Garwin Gerstein & Fisher tag, all counsel, Stuart

21    Des Roches, who argued today, have all been admitted pro

22    hac, and we got the impression space is at a premium, so

23    Betsy and I thought we just ought to rise.

24              THE COURT:  I don't have an objection.

25              MR. GODDESS:  Thank you.
```

```
 1                      THE COURT:  I will certainly call on you if you

 2       are needed, but at this point, you are excused.

 3                      MS. McGEEVER:  Thank you, your Honor.

 4                      MR. GODDESS:  Thank you.

 5                      THE COURT:  All right.  Defendants' counsel?

 6       Mr. Cavanaugh?

 7                      MR. CAVANAUGH:  Thank you, your Honor.

 8                      Your Honor, Ms. Davis will address the

 9       deposition testimony questions, so let me just deal with a

10       couple of the housekeeping issues.

11                      Your Honor, given the length of the trial and

12       the onset of Thanksgiving, we would strongly urge a jury of

13       ten.

14                      And while we're on the subject of the length of

15       trial, your Honor had originally suggested that the

16       plaintiffs be given 30 hours of time and that the defendants

17       would be given 24 hours of time.  I noted some concern about

18       that at the time and that was when the Indirects were still

19       in the case.  They're now out of the case.

20                      Your Honor, I think time should be split evenly.

21       I think it's just going to lead to mischief.  If I look at

22       the plaintiffs' list, they're calling four different

23       economists and two improvement experts.  I think the 30

24       hours they believe gives them the luxury of providing

25       repetitive testimony from varying experts, and this case
```

```
 1    should not be decided on the weight of the cumulative impact

 2    of repetitive opinion testimony.

 3              So, your Honor, we would, again, ask that you

 4    split the time evenly, or, at a minimum, give them a, you

 5    know, perhaps an hour or two more on that.

 6              With respect to Hatch-Waxman, your Honor, our

 7    position on Hatch-Waxman, we just don't see how it's

 8    relevant.  With sham litigation out of this trial, there's

 9    no reason to be even talking about Hatch-Waxman as we see

10    it.

11              We will submit a counterproposal to the

12    plaintiffs, but our position is we just don't see the

13    relevance of Hatch-Waxman here now that sham litigation is

14    not in this phase.  We don't think we should be talking

15    about litigation, patent litigation, in this trial.  It's

16    just not relevant in this phase.

17              I think that is it for the housekeeping

18    matters, your Honor.  Ms. Davis will address the

19    evidentiary issue.

20              THE COURT:  All right.  Thank you.

21              MS. DAVIS:  Thank you, your Honor.

22              You've indicated that your ordinary practice

23    would be not to permit one party to call an expert of the

24    other that, that was designated by the other party.  The

25    reason that we would submit that that is appropriate here
```

1    is -- well, as an initial matter, plaintiffs collectively

2    designated 35 experts in this case.  Their current witness

3    list includes only six of those experts.  Defendants were

4    put to the cost of, and the burden of, deposing all of the

5    experts, then going through the entire process of expert

6    discovery for 35 experts.

7              Now, admittedly, some of those experts dropped

8    out of the case as certain claims dropped out, but with

9    respect to the physician testimony that's at issue here,

10   there were four witnesses designated by the plaintiffs and

11   only one remains on their witness list.

12             It's clear why that is.  The experts have

13   provided testimony that is contrary to the plaintiffs'

14   relevant market allegations or directly supportive of

15   defendants' defenses in this case.

16             By way of example, the plaintiffs contend

17   that Fenofibrate is a triglyceride-lowering drug and that

18   statins do not serve that purpose equally well.  And one of

19   the experts at issue here, who is a physician, a

20   cardiologist, testified that when he needs to treat

21   elevated triglycerides, he, in fact, uses statins, not

22   Fenofibrate.  He does not use Fenofibrate at all.  That

23   was fact testimony by that witness.  So we believe that

24   should come in irrespective of the fact that he was

25   designated as an expert witness by the plaintiffs.

1              There are other examples.  Another expert

2    witness testified that if all of the products remained on

3    the market, he would titrate, or start with the lowest dose

4    and then increase to a higher dose, to a different product

5    that has a higher dose.  And that is precisely an argument

6    that the plaintiffs have made for a while, all the products

7    did not remain on the market at the same time because it

8    would create confusion in the marketplace.

9              So this is extremely relevant testimony that was

10   provided by their own experts and that we would like to use

11   in the case now.

12             The plaintiffs cited the Kirk case, which did

13   not deal with Rule 32.  The two opinions that have been

14   recently issued by Judge Jordan are Vanderprak v. Alfieri

15   and Novozyme versus Genencor, and I have both of those

16   opinions, if the Court would like to see them.

17             But in both cases, Judge Jordan ruled that this

18   precise action was permitted because Rule 32 creates a

19   separate exception to the hearsay rule.  The testimony is

20   not hearsay where the plaintiffs had reasonable notice of

21   depositions, were represented there and were permitted to

22   ask questions of the witness.  The witnesses are not within

23   the subpoena power of the Court, so we're not able to bring

24   them here, and Rule 32 does not distinguish between experts

25   and fact witnesses.

```
 1              And the Kirk case, which is the only Third

 2   Circuit opinion on this issue, which was cited by the

 3   plaintiffs, as Judge Jordan explained, is entirely

 4   inapposite here because it dealt with testimony from a

 5   different case, not from the same case.  So the Rule 32

 6   issue did not arise.

 7              Under the Jordan opinions, not only should we be

 8   permitted to call the witnesses by designation, but to

 9   inform the jury that the witness was hired by the plaintiff.

10   It allows the jury to gauge the credibility of the witness

11   and provides them with an understanding of the influences

12   that were brought to bear on the expert.

13              As I've stated, we believe that all three of

14   these witnesses should be permitted to be called as expert

15   witnesses, but, in addition, they provide fact testimony

16   about what they as physicians do that is supportive of

17   defendants' case and contrary to plaintiffs' case.

18              And we would submit that, at the very least, we

19   should be permitted to use the testimony to that end.  And I

20   do have copies of the two opinions, if your Honor would like

21   to see them.

22              THE COURT:  No.  I surely don't need to see

23   opinions of other judges on evidentiary issues.  Thank you

24   very much.

25              But do let me ask this question.
```

1           MS. DAVIS:  Oh, sure.

2           THE COURT:  The deposition experts that you are

3    talking about, you are saying that some of it is really fact

4    testimony and other is expert testimony?  Are you saying

5    because it's intertwined, you can consider all of it fact

6    testimony and so you just want to get it in under an

7    alternative theory?

8           MS. DAVIS:  That's not exactly what I'm saying,

9    your Honor.  I think that the testimony should be able to

10   come in under Rule 32 as expert testimony.

11          THE COURT:  Well, but that's not my question.

12          MS. DAVIS:  Okay.

13          THE COURT:  My question is:  How do you

14   differentiate the fact from the expert?

15          MS. DAVIS:  Well, I think it's clearly

16   differentiated.  These are practicing physicians who were

17   hired as experts and provided expert opinion testimony on,

18   for instance, whether one product treats a lipid as, you

19   know, a certain lipid as well as another product does, on

20   whether one product is improved over another product,

21   various issues that are present in this case.

22          But in the course of doing so, they also provide

23   fact testimony on what they, as physicians, do in their

24   prescribing practices.

25          THE COURT:  Well, what I will ask you to do is

 1    identify the fact part of the testimony, identify that for

 2    plaintiffs, and we'll go from there.

 3                   MS. DAVIS:  All right.  We would be happy to do

 4    that.

 5                   Thank you, your Honor.

 6                   MR. CAVANAUGH:  Your Honor, if I could just

 7    follow up to that.

 8                   If I'm recalling correctly, I think your Honor

 9    does, however, permit using to impeach one expert, testimony

10    from another expert, regardless of whether the party is

11    calling that expert.

12                   Am I recalling --

13                   THE COURT:  You can impeach an expert with a

14    rock.

15                   MR. CAVANAUGH:  That was the example I recall,

16    your Honor.  Thank you.

17                   MR. ARNOLD:  As long as you don't hit him with

18    it?

19                   MR. VAN NEST:  Just a couple of followup points,

20    your Honor.

21                   First of all, we don't acknowledge that any of

22    the deposition testimony from Drs. Robbins or Grimm or Soto

23    is other than expert.  They're expert treating physicians.

24                   I understand your Honor has not ruled, will look

25    at what they designate, but the idea that you are going to

1    present testimony about what physicians do as some kind of

2    fact testimony is simply wrong.  These physicians have

3    nothing to do with the facts of our case.  They're

4    testifying about practices of physicians in general.  That

5    is expert testimony; that is not fact testimony.  These are

6    not precipient witnesses that were involved in a relevant

7    offense here, and that's why I think your Honor's general

8    rule should apply here and we will continue to resist those

9    experts.

10           With respect to Hatch-Waxman, I appreciate

11    counsel's offer.  I disagree.  I think the Court has already

12    said that jurors can't be kept in the dark about the

13    circumstances here, and although your Honor has severed

14    our sham litigation claims, I don't think the case can be

15    tried without any discussion of litigation whatsoever.  I

16    mean, the only way that the defendants had the time to

17    switch products was to file lawsuits and get advantage of

18    the 30-month stay.

19           We certainly understand that we cannot contend

20    in this trial that the lawsuits were sham or lacked a

21    good-faith basis.  However, we can't put blinders on and

22    present to the jury a skewed set of facts.

23           The fact of the matter is that lawsuits were

24    filed and stays were issued, and during those stays, the

25    plaintiffs, particularly my clients and Teva, were unable to

```
 1    enter.

 2              They are going to be contending on the defense

 3    side that we should have entered sooner and we should have

 4    been in the market and we had every opportunity.  We

 5    couldn't be in the market.  And it's going to be extremely

 6    misleading to try to give the jury half the facts without

 7    all the facts.

 8              And I will ask Mr. Arnold to address the

 9    splitting of time.  I know that we've been very, very --

10    working very, very hard based on the times that your Honor

11    gave us, and there's a good reason for that.

12              THE COURT:  I'm not sure actually I need to hear

13    much about it.

14              MR. ARNOLD:  Okay, your Honor.  Actually, I was

15    just going to do a roll call of all the different plaintiffs

16    here and the case they've brought, but you obviously

17    understand that.

18              I would ask, if it's okay, I would like Mr.

19    Des Roches to address just the Hatch-Waxman portion of that

20    argument.

21              MR. DES ROCHES:  Just one quick point, your

22    Honor.  The points that Mr. Van Nest made about the 30-month

23    stays on the litigation, definitely a portion of it, which

24    explains why Hatch-Waxman needs to be explained to the

25    jurors.  It's a little bit more than that as well.  It has
```

1   to do with the AB-rating system that I know your Honor is

2   familiar with.

3          Upon the expiration of patents and FDA

4   exclusivities, Hatch-Waxman is designed such that relying

5   on bioequivalents testing, the generics get very quick

6   approvals and then have available not only to them, but to

7   all purchasers, a very efficient means of distributing their

8   product through the AB-rating system.

9          Hatch-Waxman period works hand in glove with the

10  State substitution laws of all 50 states so generics get to

11  market very quickly upon the expiration of patents and

12  exclusivity periods, and there's a very, very cost-effective

13  efficient system that exists for AB-rated generics to be

14  substituted for brands, and that helps explain why their

15  conduct is so anticompetitive.  Due to the Hatch-Waxman

16  system and the way it operates is why they did what they

17  did.

18         And I'm going to quote one document.  Your

19  Honor, I never leave New Orleans and come to Wilmington

20  without this document and this quote in my back pocket.

21  This is from a regulatory, the head of Regulatory Affairs,

22  or one of their Directors of Regulatory Affairs at Fournier

23  following up on meetings that they had with Abbott in 1998,

24  when they were trying to decide what to do, to deal with the

25  threat of generic harm.  Agnes Westerling said, I have a

1    similar understanding from the Abbott meetings.  It seems

2    critical to prevent generics to have access to AB-rating at

3    least for some time by introducing a different formulation,

4    tablets, as soon as possible.

5              Now, to understand what that means, we need to

6    have that jury understand what Hatch-Waxman means in terms

7    of AB ratings and working hand in glove with state

8    substitution laws.

9              So an understanding of Hatch-Waxman is certainly

10   critical to the 30-month stays.  That deals with the sue,

11   as your Honor called it, the sue and switch portion.  Well,

12   Hatch-Waxman relates to the sue portion with the 30-month

13   stays.  It also relates directly to what your Honor said,

14   and switch.  Hatch-Waxman relates to both those pieces.

15             So regardless if one piece is in or one piece is

16   out, Hatch-Waxman is very much at play in this case and is

17   very helpful for a jury to understand why it is that the

18   defendants' conduct was anticompetitive.

19             Thank you, your Honor.

20             MR. CAVANAUGH:  Your Honor, Hatch-Waxman

21   does not talk about an automatic substitution.  That's a

22   question of State law.  And it is, at least Teva's and

23   Impax's theory in this case, that they have an intrinsic

24   right to require us to keep selling a product and not to

25   introduce new products so that they can take advantage of

1    automatic substitution.

2              As your Honor knows from reading our

3    submissions, that's a fundamental issue of disagreement

4    here, but I don't think it raises a Hatch-Waxman issue.

5              I stand because I wanted to respond to Mr.

6    Van Ness' point, because I'm concerned that they want

7    to get the jury a little bit pregnant on this point of

8    sham litigation.  Well, we want to tell you lawsuits were

9    pending.  We want to tell you there were these stays, but,

10   you know, and then let the jury wonder what's going on

11   here.

12             Sham litigation is out of this case.  I don't

13   see why the jury needs to be instructed about 30-month

14   stays, about pending litigation between the parties.  I

15   just don't think it's relevant to this phase of the

16   litigation.

17             THE COURT:  Well, I want to look to see what

18   you do.  I mean, it seems to me as though what defendants

19   are saying is, we switched because we felt we had a better

20   product.  What plaintiffs are saying, we switched for

21   anticompetitive reasons, and you were able to do so because

22   of the regulatory background.

23             Now --

24             MR. CAVANAUGH:  Your Honor, we say two things.

25   One, we had an improved product and, two, as -- this is one

1    of the issues that's briefed before your Honor.  We have the

2    right to avoid free-riding by generic competitors.

3                    MR. HOLDING:  Your Honor, if I may, just to put

4    a little bit more fact on this, let me give you one example

5    of why the timing that comes from this is absolutely

6    critical and, of course, whether they have a better product

7    or not has nothing to do with pulling a product off the

8    market.

9                    Let's be clear.  This is not Nexium, what we are

10   alleging is a forced switch.  But let me talk to you a

11   little bit about some documents from the second switch, a

12   document --

13                   THE COURT:  I actually believe some background

14   is necessary, so I don't think plaintiffs need to be making

15   the argument.  I think it's really defendants who need to

16   convince me --

17                   MR. HOLDING:  I will sit down.

18                   THE COURT:  I think that's a wise choice.

19                   I think defendants need to convince me -- I

20   don't know that defendants can convince me that there needs

21   to be no explanation at all of the regulatory background,

22   but, certainly, I think what defendants probably need to

23   focus on is to make it an appropriate and balanced

24   explanation of the regulatory background.  So that's, I

25   think, what we should be working toward.

```
 1                 All right.  I certainly have lots of homework.
 2     You've got some homework.  I will try to get my decisions
 3     out to you by next week, and you owe me some things by
 4     Friday, which is the voir dire -- not the voir dire.  The
 5     preliminary instructions.
 6                 MR. CAVANAUGH:  And, your Honor, if we have not
 7     submitted jury instructions on a disk -- I think we have,
 8     but I am going to go back to Ms. Graham's office and
 9     double-check.
10                 MS. GRAHAM:  We'll check on that.  You don't
11     have to come back and do that.  I hope I can do something
12     here, your Honor.
13                 THE COURT:  Well, as I said, we have so many,
14     quite frankly, patent cases lined up in the flight pattern,
15     that this can get lost.  So I just want to make sure that I
16     have something that I can work with easily so that my staff
17     isn't retyping all sorts of things.
18                 MR. VAN NEST:  Your Honor, excuse me.  On the
19     subject of disks, do you want -- your pretrial order,
20     there's a new one, pretrial instructions, does not address
21     this.  Do you want a disk of all of the trial exhibits in
22     advance of trial?  Bringing you the hard copy ahead of time
23     you will not like because it's many boxes.  If you would
24     benefit from having a disk, the parties are willing to
25     submit it, but that's completely up to your Honor.
```

```
 1                    THE COURT:  Well, the problem is, even though

 2    you've got a disk of every document that might possibly be

 3    admitted, it's not a disk of what's actually admitted.  I

 4    think that's better handled under my new guidelines for

 5    post-trial briefing which you can read.

 6                    And, again, with respect to how documents are

 7    admitted and the self-restraint that you need to use,

 8    otherwise, this jury procedure is really just a sham.  I

 9    mean, you really need to make this case understandable and

10    not just throw in every exhibit that could possibly have

11    some relevance here.

12                    So on the first day, maybe after jury selection

13    on that Friday, we need to talk specifically about what the

14    process is that you are going to use to admit exhibits so

15    that everyone is doing it the same way.

16                    MR. VAN NEST:  Fair enough.

17                    THE COURT:  Okay?

18                    MR. CAVANAUGH:  That's fine, your Honor.

19                    THE COURT:  All right.

20                    MR. CAVANAUGH:  Your Honor, when you suggested

21    giving books to the jury, you were not excluding also using

22    the large screen?

23                    THE COURT:  No.

24                    MR. CAVANAUGH:  We've used in the past.

25                    THE COURT:  Not at all.  And not every document
```

```
1    is going to be critical for a jury.  Again, it is important

2    for the jury to identify documents with important points,

3    but I would think you would want to be more focused on the

4    jury looking and listening to the witness and judging the

5    credibility than having this notebook full.  So when I say

6    exhibits in front of them, I would pick out the most

7    critical, so there would be a handful of documents that

8    you might want the jury to actually be reading along.

9    All right?

10                  MR. VAN NEST:  We'll do it.

11                  MR. CAVANAUGH:  Thank you, your Honor.

12                  MS. GRAHAM:  Your Honor, could I just make one

13   comment?

14                  THE COURT:  Yes.

15                  MS. GRAHAM:  As a Delawarean who gets to

16   experience the joys of I-95 and Route 1, I really think,

17   with respect to the number of jurors, that it would be

18   very prudent to take the maximum number that your Honor

19   would consider.

20                  I've had a patent trial that was only a week

21   that lost its two extra jurors, and especially with this

22   number of parties, to get everybody back here at some point

23   if we lost, you know, if we lost two, let's say, or even

24   three, you know, over what you -- of what we would have to

25   have, that would just be really unfortunate.  And not only
```

1    given the holidays, but the uncertain times, I think

2    people's lives are a lot more disruptive than they were

3    two years ago, and so I would just suggest that -- I don't

4    think the issue of how many people we have to persuade

5    should be the guiding principle here, but what's going to

6    get us a jury that's going to last so we only have one

7    trial.

8            THE COURT:  Well, as I said, I've had some

9    concerns, particularly since we draw jurors from downstate,

10   which is two-plus hours away.  It makes it difficult.

11           MS. GRAHAM:  Right.

12           THE COURT:  So I will consider all of that.

13           All right.  Counsel, thank you very much.

14           (Counsel respond, "Thank you, your Honor.")

15           (Court recessed at 11:05 a.m.)

16                       -  -  -

17

18

19

20

21

22

23

24

25